UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOHN B. HARWOOD, Plaintiff, :
:
v. : CA 04-59T
:
ADDISON-DAVIS DIAGNOSTICS, INC., alias MEDTEST, alias John Doe,[1] Defendant. :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the court is the Application to Court for Entry of Judgment by Default Against Defendant (Document #13) ("Second Application" or "Second Application for Default Judgment"). Plaintiff John B. Harwood ("Plaintiff") seeks entry of judgment

---

[1] This action was originally filed on February 25, 2004, under the caption "JOHN B. HARWOOD vs. QT 5, INC.; STEVEN REDER in his capacity as President of QT 5, INC.; TIMOTHY OWENS in his capacity as CEO of QT 5, INC.; and NORMAN KUNIN as Chief Financial Officer/ Treasurer of QT 5, INC." Complaint (Document #1). QT 5, Inc., changed it name to ADDISON-DAVIS DIAGNOSTICS, INC., on or about November 18, 2004. <u>See</u> Plaintiff's Memorandum in Support of Entry of Final Judgment (Document #17) ("Mem. in Support"), Exhibit ("Ex.") O (Press Release announcing name change dated 12/8/04) at 1.

On February 2, 2005, Plaintiff filed a motion to amend the caption to "properly reflect the present name of the single Defendant in interest, 'ADDIS[]ON-DAVIS DIAGNOSTICS, INC.,' alias MEDTEST, alias John Doe." Motion to Amend Caption (Document #21) ("Motion to Amend") at 1. The Motion to Amend also stated that each individual listed in the original caption "was identified in his or her capacity as an officer of said QT-5, Inc.[,] therefore liability rests only upon the corporate entity." <u>Id.</u> at 1. The Motion to Amend was granted on February 23, 2005. <u>See</u> Order of 2/23/05 (Document #23).

On March 2, 2005, Plaintiff filed a Corrected Motion to Amend Caption (Document #25) ("Corrected Motion to Amend") to correct a typographical error in the earlier motion. This corrected motion was granted, and the Clerk was directed to change the caption in this action to reflect the change in the name of the corporate Defendant from QT 5, INC., to ADDISON-DAVIS DIAGNOSTICS, INC., and the deletion of the names of the individual defendants. <u>See</u> Order to Change Caption dated 3/4/05 (Document #26).

27

by default against Defendant Addison-Davis Diagnostics, Inc. because of its failure to "plead or otherwise defend within twenty days of service." Affidavit of Service and Failure to Plead or Otherwise Defend (Document #9) ("DiMaio Aff."). The Second Application has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.R.I. Local R. 32(a). Hearings on the Second Application were held on January 4 and 25, 2005. For the reasons stated below, I recommend that the Second Application be granted.

**I. Facts and Travel**

This is an action for breach of contract (Count I) and for fraud (Count II). See Complaint (Document #1) ¶¶ 6-12. Plaintiff, a resident of the State of Rhode Island, alleges that on or about June 9, 2003, he entered into an agreement with QT 5, Inc. ("QT 5"), Steven Reder ("Reder"), Timothy Owens ("Owens"), and Norman Kunin ("Kunin"). See id. ¶¶ 1-6. Reder and Owens were at that time, respectively, the President and Chief Executive Officer of QT 5. See id. ¶¶ 3-4. Kunin became the Chief Financial Officer/Treasurer of QT 5 on or about August 8, 2003. See Plaintiff's Memorandum in Support of Entry of Final Judgment (Document #17) ("Mem. in Support"), Exhibit ("Ex.") M (Press Release dated 8/8/03[2]). Kunin's position with QT 5 on

[2] This press release is dated "Friday August 8," but no year is stated. See Plaintiff's Memorandum Regarding Relatedness, Purposeful Availment, and Reasonableness (Document # 24) ("Mem. Re Relatedness"), Ex. M (Press Release dated 8/8/03). The court deduces that the year is 2003 based on all the information in the record and the fact that in the year 2003 August 8 was a Friday. The court uses the same process of deduction for determining the year of two other press releases which similarly lack years. See id., Ex. A (Press Release dated 5/28/03); Mem. in Support, Ex. B (Press Release dated 5/30/03).

June 9, 2003, is not reflected in record.[3] Reder, Owens, and Kunin are all residents of California. See Complaint ¶¶ 3-5.

QT 5, which is now known as Addison-Davis Diagnostics, Inc. ("ADD"),[4] and will hereafter be referred to as ADD, is a Delaware corporation and has its headquarters in Westlake Village, California. See Plaintiff's Memorandum Regarding Relatedness, Purposeful Availment, and Reasonableness (Document # 24) ("Mem. Re Relatedness"), Ex. A (Press Release dated 5/28/03) at 1. In 2003, ADD was in the business of manufacturing and marketing NICOWater(TM) ("Nico Water"), bottled water laced with nicotine, which was intended to relieve the symptoms of tobacco cravings. See Mem. in Support, Ex. M, Ex. P (Affidavit of Witness, David A. Lowman ("Lowman Aff.")) ¶ 7. The product was targeted at tobacco users who were restrained from smoking in certain public places as a result of legislation outlawing such conduct. See Lowman Aff. ¶ 7.

Early in 2003, James Burns ("Burns") "became the Regional Sales Manager of Nico International, Inc. ("Nico"), a wholly owned subsidiary of [ADD]." Lowman Aff. ¶ 5. Burns approached a Rhode Island resident, David A. Lowman, for assistance in the promotion, marketing, and sales of Nico Water in the New England area. See id. ¶ 6. Together, Burns and Lowman marketed Nico Water to a number of Rhode Island companies, including Brooks Pharmacy, CVS, C&C Distributors, and Northeast Beverage. See id. ¶ 8.

Between January 9, 2003, and October 14, 2003, Lowman attended meetings or events relating to the marketing or distribution of Nico Water on thirty-eight occasions. See Lowman

---

[3] Plaintiff may not have intended to allege that Kunin entered into an agreement with Plaintiff on June 9, 2003, but that is what the Complaint, read literally, alleges. See Complaint (Document #1) ¶ 6.

[4] See n.1.

Aff., Ex. 2 (Events regarding Nico Water). Of the thirty-eight meetings or events, at least twenty-six of them occurred in Rhode Island, including nine at the Warwick, Rhode Island, office of Brooks Pharmacy, three at the main office of CVS in Woonsocket, Rhode Island, three at the Warwick office of Northeast Beverage, and two at the West Warwick, Rhode Island, office of C&C Distributors. See Lowman Aff., Ex. 2; see also Supplemental Affidavit of Witness, David A. Lowman ("Lowman Supp. Aff.") ¶¶ 4-7.[5] Burns was with Lowman for fifteen of the meetings or events in Rhode Island. See Lowman Aff., Ex. 2. David Powley ("Powley"), Nico's Director of Sales, attended four of the meetings or events in Rhode Island with Burns and Lowman. See id.; see also Mem. Re Relatedness, Ex. C (Plaintiff, John B. Harwood's Supplemental Affidavit ("Harwood Supp. Aff.")) ¶ 4; id., Attachment ("Att.") (Business card of Powley). ADD's president, Reder, attended a February 20, 2003, meeting at CVS with Lowman. See Lowman Aff. ¶ 10.

Lowman was a friend of Plaintiff's. See Harwood Supp. Aff. ¶ 4. According to Plaintiff, "all [Lowman] talked about the whole beginning of the year, 2003, was this new product, Nico Water and [ADD]." See id. In the spring of 2003, Plaintiff was contacted by agents or employees of ADD, who solicited him to help promote their product in Rhode Island and other states and also in Europe. See id. Plaintiff received numerous phone calls in April and May of 2003 from these agents or employees. See id. He had approximately twelve to fifteen meetings with them in Rhode Island. See id. ¶¶ 1, 8. At some point during this period, Plaintiff apparently agreed to promote and plan the introduction of ADD's products in Rhode Island and other states

---

[5] The meetings outside of Rhode Island, appear to have occurred in Connecticut, Massachusetts, Maine, or New York. See Mem. in Support, Ex. P (Affidavit of Witness, David A. Lowman ("Lowman Aff.") ¶ 9; id., Ex. 2; Supplemental Affidavit of Witness, David A. Lowman (Document #20) ("Lowman Supp. Aff.") ¶¶ 3-8.

and also in Europe. See Harwood Supp. Aff. ¶ 2.

Between May 19 and May 23, 2003, ADD sold and delivered 1500 cases of Nico Water to Brooks Pharmacy. See Lowman Aff. ¶ 11. In addition, C&C Distributors and Northeast Beverage split the delivery of one truckload of the product. See id.

On May 28, 2003, ADD issued a press release, announcing the "national launch and roll-out [of Nico Water]." Mem. Re Relatedness, Ex. A (Press Release dated 5/28/03) at 1. This was followed on May 30, 2003, by a second press release which announced that Nico Water "is now available at all Brooks Pharmacy locations throughout the New England area." Id., Ex. B (Press Release dated 5/30/03) at 1. The second press release noted that Nico Water had "been shipped to Northeast Beverage Corp., Rhode Island Distributing, Providence Beverage[,] and C&C Distributing for distribution to multiple northeastern states." Id. ADD's president, Reder, was quoted as stating that the company had chosen "Brooks for our regional introduction because of their strong demographics and leading edge approach to providing their customers with the most comprehensive selection of pharmacy, healthcare and lifestyle products." Id. The second press release went on to state:

> In addition to high visibility in Brooks' direct and in-store advertising vehicles, the [Nico Water] campaign includes newspaper and radio advertising targeted specifically to Brooks Pharmacy communities announcing immediate availability. [ADD] Vice President of Marketing, Randall VyDuna, notes, "Although we intend to provide all of our resellers with strong promotional support, as 'first to market' Brooks will certainly be rewarded and benefit greatly from our introductory marketing push ...."

Mem. Re. Relatedness, Ex. B at 1. Brooks Pharmacy ran an advertisement for the product the week of June 1, 2003, in the Providence Journal. See Lowman Aff. ¶ 11.

During the week of June 1, 2003, Lowman spoke with Powley

and Reder regarding expanding ADD's business into Europe. See Mem. Re Relatedness, Ex. F (Second Supplemental Affidavit of Witness, David A. Lowman ("Second Supp. Lowman Aff.") ¶ 4. Lowman opined that Plaintiff could help them in Europe and suggested that they formalize their relationship with Plaintiff. See id. ¶¶ 4-5. According to Lowman, Plaintiff had "already helped a lot in Rhode Island ...," id. ¶ 5, and Lowman believed that Plaintiff would be an asset to the company, see id. Powley asked if he could meet with Plaintiff. See id. ¶ 6. Lowman called Plaintiff and asked if Plaintiff would be interested in meeting Powley and Burns[6] for dinner. See id. Plaintiff said yes, and Lowman made dinner reservations for June 5, 2003, at the Capital Grille Restaurant in Providence, Rhode Island. See id.

Powley, Burns, Lowman, and Plaintiff met for the planned dinner on June 5th. See id.; see also Harwood Supp. Aff. ¶ 3. They discussed Plaintiff's past and future involvement in marketing Nico Water in Rhode Island, other states, and Europe. See Harwood Supp. Aff. ¶ 3. No specific assignment or fee was discussed with Plaintiff at that time. See id. According to Plaintiff, the dinner was "more getting to know each other but with the prospect of firming up our relationship." Id.

The next day, June 6, 2003, the Associated Press reported that a Maine state legislator had introduced a bill to ban the sale of bottled water laced with nicotine. See Mem. Re Relatedness, Ex. D (Associated Press news report dated 6/6/03). The news report stated in part:

---

[6] Loman actually states that he asked Plaintiff "whether he would be interested in meeting with the Defendants for dinner." Mem. Re Relatedness (Document #24), Ex. F (Second Supplement Affidavit of Witness, David A. Lowman ("Second Supp. Lowman Aff.") ¶ 6 (italics added). The court assumes that "Defendants" refers to Powley and Burns. Although Powley and Burns are not defendants in this action, they are agents or employees of ADD, and they attended the June 5, 2003, dinner with Plaintiff and Loman. See id.

> A bill introduced Thursday [June 5, 2003] by Sen. John Martin ... took aim at Nico Water, which is sold in half-liter bottles containing 4 mg of nicotine, an amount equal in punch to two cigarettes.
>
> That same day, Brooks Pharmacy, based in Warwick, R.I., said it would no longer be selling Nico Water.
>
> "There's just too many questions being asked. We don't need to create any confusion in our stores. We have very simple stores with nice products and we don't want any controversy," said Bill Welsh, the drug chain's executive director.

Mem. Re. Relatedness, Ex. D.

The same day the story appeared Lowman received a telephone call from Powley, who stated "that they had just learned of legislation introduced in Maine to ban the sale of their product, Nico Water." Second Supp. Lowman Aff. ¶ 7. Powley brought Reder and Owens into the conversation via a conference call. See id. Reder and Owens discussed compensating Plaintiff for consulting services and advice regarding defeating the proposed legislation in Maine. See Second Supp. Lowman Aff. ¶ 7.

Apparently, the decision was made to seek Plaintiff's assistance because he affirms that:

> [O]n June 6, 2003, I received a call from [ADD] regarding an issue in the State of Maine. Before I agreed to do anything more or go anywhere, especially anything out of state, I needed a specific deal placed in writing. Once we orally agreed, Steve Reder and Tim Owens, both officers for [ADD] called me to go over the situation.

Harwood Supp. Aff. ¶ 3.

On June 9, 2003, Reder sent an e-mail to Lowman which stated:

> Per our agreement we will be sending John Howard [sic]:
>
> $10,000 Check
> $40,000 Warrants
> upon successful completion $100,000
>
> Thank you for all your help.

Steven H. Reder
President
[ADD]
5655 Lindero Cyn. Rd. Suite 120
Westlake Village, CA 91362
Phone: (818) 338-1510
Direct Phone: (818) 338-1517
Fax: (818) 338-1550

Lowman Aff., Ex. 3 (e-mail dated 6/9/03); see also id. ¶ 13; Second Supp. Lowman Aff. ¶ 7.

The day after the above e-mail was received, Plaintiff and Lowman went to Maine. See Harwood Supp. Aff. ¶ 3; Lowman Aff., Ex. 2 at 1. Plaintiff's purpose in going was to "give what help [he] could to defeat and prevent passage of proposed legislation in that legislative session regarding the Nico Water product." Harwood Supp. Aff. ¶ 3; see also Complaint ¶ 7.

Prior to filing his Complaint in this court, Plaintiff mailed a copy of a proposed complaint to ADD on or about January 21, 2004. See Mem. in Support, Ex. F (Letter from Owens to Harwood of 1/23/04)(so indicating). ADD's then CEO, Owens, responded in a January 23, 2004, letter mailed to Plaintiff at his Pawtucket, Rhode Island, address. See id. Owen's letter stated that ADD denied the allegations set forth in Plaintiff's proposed complaint and denied that "an agreement was completed between you and this company." Id. Noting that Plaintiff had sent ADD a letter on June 18, 2003, which referenced an "agreement dated June 9, 2003," id., but which was not attached to Plaintiff's June 18, 2003, letter, Owen requested that Plaintiff "send a copy of the alleged agreement executed by an officer of this company on June9 [sic], 2003," id.

Plaintiff filed his Complaint (Document #1) on February 25, 2004. See Docket. In Count I he alleges that ADD entered into an agreement with him on or about June 9, 2003, pursuant to which he was "to travel to the State of Maine to resolve certain business problems involving a product owned and sold by [ADD]."

Complaint ¶ 6. Plaintiff further alleges that on or about June 10, 2003, he performed the requested services for the agreed fee which totaled $150,000.00, see id. ¶ 7, but that ADD failed to pay him his fee, thereby breaching their agreement, see id. ¶ 8. In Count II, Plaintiff charges that he was fraudulently induced to perform the above described services for ADD and that ADD willfully and intentionally deceived him into performing such services without any intention of paying him. See id. ¶ 11. He alleges that he has demanded payment from ADD for the services rendered but that ADD has refused to make the agreed payments. See id. ¶ 12.

On March 25, 2004, Plaintiff filed four Summons in a Civil Case ("Summons") (Documents #2,[7] #3 and #4) which were each docketed as a "Return of Service." See Docket entries for 3/25/04. The Return of Service form on the back of each Summons had not been completed and was entirely blank. See Documents #2-4. However, attached to each Summons was a copy of an unsigned letter dated February 26, 2004, from Plaintiff's attorney to the defendant identified in the Summons. See Summons (Document #2), Att. 1 (Letter from DiMaio to Owens of 2/26/04); see id., Att. 3 (Letter from DiMaio to Kunin of 2/26/04); Summons (Document #3), Att. 1 (Letter from DiMaio to Paracorp Incorporated of 2/26/04); Summons (Document #4), Att. 1 (Letter from DiMaio to Reder of 2/26/04). Each letter indicated that it has been sent by certified mail, return receipt requested, and stated:

> Enclosed please find a Summons and Complaint relative to the above-captioned matter. In accordance with the Rhode Island General Laws and Federal Rules of Procedure,

[7] Plaintiff filed four Summons in a Civil Case ("Summons") which were docketed as Documents #2, #3, and #4. Two of the Summons (those addressed to Timothy Owens and Norman Kunin) were docketed as a single document, Document #2. The Summons addressed to ADD was docketed as Document #3, and the Summons addressed to Steven Reder was docketed as Document #4.

you are[8] hereby duly served.

> You have twenty (20) days in which to file an answer to protect your interest.

Id. Attached to each letter was a photocopy of a United States Postal Service return receipt form reflecting that the letter was delivered either on March 1, 2003, see Summons (Document #3), Att. 2, or March 2, 2003, see Summons (Document #2) Att. 2; id., Att. 4; Summons (Document #4), Att. 2.

It appears that during or around March of 2004, settlement discussions occurred between the parties. On March 17, 2004, Reder faxed a memorandum of understanding to Plaintiff in Rhode Island which set forth the basic terms of a settlement agreement. See Mem. in Support, Ex. G at 1 (Fax Cover Sheet dated 3/17/04), 2 (Memorandum of Understanding). ADD would pay Plaintiff $10,000.00 upon signing a general release and $50,000 in shares of common stock "at a per share price equal to the closing price on the day following the effective date of the Company's pending reverse stock split." Id. at 2. Plaintiff would execute a full release of the named defendants[9] in the lawsuit. See id. Reder indicated that a formal agreement would be prepared and forwarded to Plaintiff within the next several days. See id. The memorandum of understanding was signed by both Reder and Plaintiff. See Plaintiff's Affidavit in Proof of Claim (Document #11), Att. 1 (Memorandum of Understanding dated 3/17/04).

On March 22, 2004, ADD's secretary, Fred DeLuca ("DeLuca"), sent Plaintiff's attorney via fax "a copy of a draft of a

---

[8] The letter addressed to Paracorp Incorporated ("Paracorp"), ADD's agent for service of process, differed from the letters sent to the individual defendants in that it stated that "QT 5 is hereby duly served." Summons in a Civil Case ("Summons") (Document #3), Attachment ("Att.") 1.

[9] As previously noted, see n.1, the Complaint named not only QT 5 (ADD), but also Reder, Owens, and Kunin as defendants in their capacities as corporate officers, see Complaint.

Settlement Agreement and General Release that should dispose of the outstanding issues between the parties." Mem. in Support, Ex. H (Letter from DeLuca to DiMaio of 3/22/04). For reasons that are not apparent from the present record, Plaintiff did not execute a copy of the Settlement Agreement and General Release ("Settlement Agreement") until some three months later, on July 2, 2004. See id., Ex. I at 3-6 (Settlement Agreement). On that date Plaintiff's attorney, Joseph-Anthony DiMaio ("DiMaio"), faxed a copy of the Settlement Agreement signed by Plaintiff to DeLuca. See id. at 1 (Facsimile Cover Page dated 7/2/04). On July 7, 2004, DiMaio sent a letter to DeLuca which contained a proposed dismissal stipulation for this action and a "hardcopy of the settlement agreement which Attorney Harwood has already signed." Id., Ex. J (Letter from DiMaio to DeLuca of 7/7/04). The letter stated that once DeLuca approved the form of the dismissal stipulation DiMaio would file it and send DeLuca a certified copy of the original filing. See id. DiMaio concluded the letter by stating his understanding that DeLuca would be forwarding payment to him upon receipt of the hard copy of the settlement agreement and requesting that DeLuca send him a conformed copy of the Settlement Agreement "bearing your client's original signature." Id.

On September 23, 2004, DeLuca responded by sending DiMaio a letter, the body of which is reproduced below:

> Please excuse the delay in responding to your correspondence. The patent owner of the nicotine water was successful in terminating our right to distribute Nico Water and was granted a judgment in the sum of $222,265.00 for attorney's fees[.] A writ of execution was issued by the court that was used to execute against our bank account. As such, we have no money. Further, out stock is trading under par. We have not filed a bankruptcy petition primarily because of the lack of funds to pay an attorney. As such we cannot honor our settlement that we reached with you. If Mr. Harwood would have timely responded to our settlement offer[,] we were in a position at that time to comply. Now we are

not.

Mem. in Support, Ex. K (Letter from DeLuca to DiMaio of 9/23/04).

On October 25, 2004, Plaintiff filed an Application to Clerk for Entry of Default against Defendant (Document #5) ("First Application for Entry of Default"). According to the Docket, default was entered by the Clerk that same day. See Docket; see also Document #6. Also on October 25, 2004, Plaintiff filed an Application to Court for Entry of Judgment by Default against Defendant (Document #7) ("First Application for Default Judgment").

Subsequently, the Clerk noticed that First Application for Entry of Default did not carry a certification that a copy had been sent to ADD. The Clerk notified Plaintiff's counsel of this deficiency, and on December 8, 2004, Plaintiff filed a second Application to Clerk for Entry of Default Against Defendant (Document #8) ("Second Application for Entry of Default") and the instant Second Application for Default Judgment (Document #13). Both documents bore certifications that a copy had been sent to DeLuca, Reder, Kunin, Owens, ADD, and Paracorp Incorporated ("Paracorp"). See Second Application for Entry of Default; Second Application for Default Judgment. Upon receiving the Second Application for Entry of Default, the Clerk again entered default against ADD. See Docket entry for 12/8/04; see also Document #12.

A hearing on the Second Application for Default Judgment was held on January 4, 2005. At that time, the court questioned whether, in the circumstances presented, ADD could be served by "certified mail, return receipt requested."[10] DiMaio Aff. (Document #9). The court gave Plaintiff until January 18, 2005,

---

[10] At the time the court raised this concern the record did not contain sufficient information to allow the court to find that ADD was subject to the jurisdiction of the Rhode Island courts.

to file additional material and/or argument regarding this question. An order formalizing this ruling was issued on January 5, 2005. See Order for Further Briefing (Document #16).

A further hearing on the instant Second Application for Default Judgment was held on January 25, 2005. At that time, the court stated that the Mem. in Support (Document #17) which Plaintiff had filed on January 18, 2005, satisfactorily addressed most of the concerns identified in the Order for Further Briefing. A remaining concern was that Ex. 2 to the Lowman Aff., which listed events and/or meetings involving representatives or agents of Defendant, did not state explicitly that the events and/or meetings had occurred in Rhode Island. See Lowman Aff., Ex. 2. The court instructed Plaintiff's counsel to file a supplemental affidavit within ten days which identified specially where these events and/or meetings had occurred. Upon receipt of this supplemental affidavit, the court would decide whether a further hearing was necessary.

Plaintiff filed the requested supplemental affidavit on January 28, 2005. See Lowman Supp. Aff. (Document #20). Upon reviewing same, the court decided that no further hearing was required and took the Second Application under advisement.

Thereafter, in the process of writing this Report and Recommendation, the court concluded that the record did not contain sufficient information to allow the court to complete the required analysis regarding personal jurisdiction. See Order for Supplementation (Document #22). Accordingly, the court directed Plaintiff to file a memorandum and an affidavit by February 23, 2005, which addressed: 1) "[t]he parties prior negotiations and contemplated future consequences and actual course of dealing," id. at 2 (citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002)); and 2) "[r]elatedness, purposeful availment, and reasonableness," id.

(citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42 at 60). Plaintiff timely filed the requested documents. See Mem. Re Relatedness (Document #24).

**II. Jurisdiction**

As an initial matter, when judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to assure itself that it has jurisdiction over both the subject matter and the parties. See Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001); In re Tuli, 172 F.3d 707, 712 (9th Cir. 1999); Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 772 (10th Cir. 1997); Williams v. Life Sav. & Loan, 802 F.2d 1200, 1203 (10th Cir. 1986); Koshel v. Koshel, No. CIV.A.3:01-CV-2006-M, 2002 WL 1544681, at *4 (N.D. Tex. July 11, 2002)(holding that jurisdiction must be established as a threshold matter before a motion for entry of default judgment can be granted); see also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002)("To hear a case, a court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decision.'")(quoting United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 35 (1st Cir. 1999)); Letelier v. Republic of Chile, 488 F. Supp. 665, 668 (D.D.C. 1980)(holding that issue of subject matter jurisdiction should be fully explored despite previous entry of default); cf. Hugel v. McNell, 886 F.2d 1, 3 n.3 (1st Cir. 1989)("[W]here the court rendering the default judgment is shown to lack personal jurisdiction over the defendant, ... the judgment may be vacated and set aside by the rendering court on motion, or by another court on collateral attack.")(quoting 6 Moore's Federal Practice para. 55.09)(second alteration in original). Accordingly, this court examines both subject matter and personal jurisdiction.

**A. Subject Matter Jurisdiction**

The Complaint invokes the jurisdiction of this court pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00.[11] See Complaint at 1. Because default has already entered against ADD, see Document #12, the factual allegations of the Complaint must be taken as true. See Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985) ("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its ... claims must be considered established as a matter of law."). Accordingly, I find that the court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

**B. Personal Jurisdiction**

"In determining whether a non-resident defendant is subject

---

[11] 28 U.S.C. § 1332 provides in relevant part:

> (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--
>
> (1) citizens of different States;
>
> ....
>
> (c) For the purposes of this section ... of this title--
>
> (1) a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business ....
>
> ....
>
> (e) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

to its jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002) (internal quotation marks omitted). "A district court may exercise authority over a defendant by virtue of either general or specific [personal] jurisdiction." Id. (quoting Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n., 142 F.3d 26, 34 (1st Cir. 1998))(alteration in original).

**1. General Jurisdiction**

"General jurisdiction exists when the defendant has engaged in 'continuous and systematic activity' in the forum, even if the activity is unrelated to the suit." Id. (quoting United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir.1992)). The general jurisdiction standard is considerably more stringent than the standard for specific jurisdiction. See Barry v. Mortgage Servicing Acquisition Corp., 909 F.Supp. 65, 74 (D.R.I. 1995). "The continuous and systematic requirement has been characterized as being satisfied when the defendant's forum contacts are extensive and pervasive." Id. at 75 (citation and internal quotation marks omitted). Although Plaintiff contends that general jurisdiction exists, see Mem. Re Relatedness at 1 n.1, the court is not persuaded that ADD's contacts with Rhode Island, which are discussed in the specific jurisdiction section that follows, can fairly be characterized as "continuous and systematic," United Elec., Radio & Mach. Workers of Am., 960 F.2d at 1088, or "extensive and pervasive," Barry v. Mortgage Servicing Acquisition Corp., 909 F.Supp. at 75. Accordingly, I find that general jurisdiction is not present.

**2. Specific Jurisdiction**

Specific jurisdiction applies where "the cause of action arises directly out of, or relates to, the defendant's forum-

based contacts." United Elec., Radio & Mach. Workers of Am., 960 F.2d at 1088-89. For a court properly to exercise specific personal jurisdiction over the defendant, the requirements of both the state's long-arm statute and the United States Constitution must be satisfied. See Barrett v. Lombardi, 239 F.3d 23, 26 (1st Cir. 2001); Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994). The Rhode Island long-arm statute, as interpreted by the Supreme Court of Rhode Island, is coextensive with federal due process mandates. See Levinger v. Matthew Stuart & Co., Inc., 676 F.Supp. 437, 439 (D.R.I. 1988)(citing Conn v. ITT Aetna Fin. Co., 252 A.2d 184, 186 (R.I. 1969)); see also Brian Jackson & Co. v. Eximias Pharm. Corp., 248 F.Supp.2d 31, 34-35 (D.R.I. 2003); Microfibres, Inc. v. McDevitt-Askew, 20 F.Supp.2d 316, 320 (D.R.I. 1998). Therefore, Fourteenth Amendment due process requirements determine the exercise of personal jurisdiction in the District of Rhode Island. See Levinger, 676 F.Supp. at 439; Northeastern Land Servs., Ltd. v. Schulke, 988 F.Supp. 54, 57 (D.R.I. 1997); see also Hainey v. World AM Communications, Inc., 263 F.Supp.2d 338, 341 (D.R.I. 2003).

"Due process demands minimum contacts between a nonresident defendant and the forum such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Northeastern Land Servs., Ltd., 988 F.Supp. at 57 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). "[F]or purposes of specific jurisdiction, contacts should be judged when the cause of action arose, regardless of a later lessening or withdrawal." Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg., 259 F.3d 59, 66 (1st Cir. 2002).

The First Circuit applies a three-part analysis in evaluating minimum contacts. See Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999); Sawtelle

v. Farrell, 70 F.3d 1381, 1388-89 (1st Cir. 1995).

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Sawtelle, 70 F.3d at 1389 (quoting United Elec., Radio & Mach. Workers of Am., 960 F.2d at 1089). The Gestalt factors are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies," id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 105 S.Ct. 2174, 2184-85, 85 L.Ed.2d 528 (1985)).

**a. Relatedness**

The first of the three requirements for specific jurisdiction centers "on the causal nexus between [the defendant's] forum-based contacts and the harm underlying [the plaintiff's] complaint." Northeastern Land Servs., Ltd. v. Schulke, 988 F.Supp. 54, 57-58 (D.R.I. 1997); see also Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994)(same). Here the harm alleged is that ADD breached its contract with Plaintiff and committed fraud by inducing him to perform his part of the contract and then refusing to perform its part. For each claim, Plaintiff must show a sufficient "causal nexus" between ADD's contacts with Rhode Island and Plaintiff's causes of action. See Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7 (1st Cir. 2002)(stating that for its tort claims

plaintiff must show a sufficient "causal nexus" between non-resident defendant's contacts with forum state and plaintiff's tort claims); id. at 10 (stating same requirement for plaintiff's breach of contract claim)

"[T]he mere existence of a contractual relationship between an out-of-state defendant and an in-state plaintiff does not suffice, in and of itself, to establish jurisdiction in the plaintiff's home state." Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 290 (1st Cir. 1999)(citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478-79, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985)).

> [A] contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors--**prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing--that must be evaluated** in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King Corp., 471 U.S. at 479, 105 S.Ct. at 2185 (internal citations and quotation marks omitted)(emphasis added); see also Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002)(quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The First Circuit has instructed that "[i]n contract cases, a court charged with determining the existence *vel non* of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Phillips Exeter Acad., 196 F.3d at 289.

Based on the evidence submitted by Plaintiff, I find that ADD's contacts with Rhode Island were instrumental in the formation of the contract. ADD's employees or agents repeatedly

solicited Plaintiff in the spring of 2003 to help promote Nico Water in Rhode Island. See Harwood Supp. Aff. ¶¶ 4, 8. Plaintiff "remember[s] that there were numerous phone calls from their agents or employees in April and May of 2003." Id. ¶ 4 Although not explicitly stated by Plaintiff in his affidavit, it is reasonable to conclude that these phone calls were received by Plaintiff in Rhode Island. See id. In addition, there were approximately twelve to fifteen meetings in Rhode Island between Plaintiff and ADD's employees or agents. See id. ¶ 8. ADD's Director of Sales, Powley, specifically requested to meet with Plaintiff, and this resulted in the June 5, 2003, dinner meeting at the Capital Grille which Powley, Burns, Lowman, and Plaintiff attended. See Second Supp. Lowman Aff. ¶¶ 6-7; Harwood Supp. Aff., Att. 1 (Powley's Business Card). The dinner contributed to the development of the relationship between ADD and Plaintiff as evidenced by the fact that the very next day ADD reached out to Plaintiff for assistance with the problem which had arisen in Maine.

In addition, there is a connection between ADD's Rhode Island contacts and the harm which is the basis for Plaintiff's Complaint. Between March 18, 2003, and May 23, 2003, ADD's agents and/or employees repeatedly met in Rhode Island with officials of Brooks Pharmacy ("Brooks"), a Rhode Island company, for the purpose of persuading Brooks to sell Nico Water at its stores located throughout New England. See Lowman Aff. ¶¶ 8-9; id., Ex. 2; see also Mem. Re Relatedness, Ex. A. On May 28, 2003, ADD kicked off its national promotion of Nico Water. See Mem. Re Relatedness, Ex. B. Two days later, it issued a press release touting the news that Brooks would be the first chain to offer Nico Water. See id. Within days ADD's promotional campaign was thrown into jeopardy by the proposed Maine legislation and Brooks' withdrawal of the product from its

stores. See Mem. Re Relatedness, Ex. D. ADD reached out to Plaintiff and sought his assistance in preventing the enactment of the legislation banning the sale of its product. If ADD was going to have any chance of persuading Brooks to carry Nico Water again, obviously an initial step in that process would have to be the removal of the threat posed by this legislation. Thus, the contract with Plaintiff was related to ADD's contacts with Rhode Island in that it was important to restoring (or maintaining) the relationships which ADD had established with Brooks and other Rhode Island distributors. See id., Ex. B. Although the contract was not to be performed in Rhode Island, its successful performance would further ADD's interests in Rhode Island and the other New England states where Nico Water was being sold or distributed by Rhode Island based companies.

The "parties' prior negotiations and contemplated future consequences ... and the parties' actual course of dealing ...," Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F.3d 42, 52 (1st Cir. 2002)(internal quotation marks omitted), also support a finding of relatedness. Regarding these, Plaintiff affirms that:

> 5. The future consequences contemplated by our first contact were that we would try to sell the Defendant's products in the Brooks Drugstores in Rhode Island, which we did. We also contemplated selling the product in other states such as Maine and those contemplating smoking bans in public places.
>
> 6. Our actual course of dealing was developing a strategy to contact the purchasing personnel of the Brooks Drugstores as well as other business outlets to sell the Defendant's product, which we did.
>
> 7. The nature of that course of dealing was to sell the Defendant's product, Nico Water, in as many states as possible.

Harwood Supp. Aff. ¶¶ 5-7.

Regarding Plaintiff's tort claim of fraud, I also find that there is a connection between ADD's Rhode Island contacts and the harm about which Plaintiff complains. Accepting Plaintiff's allegations as true, he was fraudulently induced as a result of oral and written communications which were sent to him in Rhode Island to leave this state and travel to Maine and perform the services ADD had requested.

Based on all of the foregoing facts, I find that the element of relatedness is satisfied.

**b. Purposeful Availment**

The second component of the three part test, purposeful availment, serves "to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995)(quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (explaining how defendant's contacts must qualify as "invoking the benefits and protections of [the forum state's] laws"). The goal is to identify in-state activity "that would make the exercise of jurisdiction fair, just, or reasonable." Rush v. Savchuk, 444 U.S. 320, 329, 100 S.Ct. 571, 577, 62 L.Ed.2d 516 (1980). The kind of purposeful availment necessary in the First Circuit requires in-state conduct by the defendant which is both **voluntary** and which makes it reasonably **foreseeable** that the defendant might be sued in the forum. See Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 207 (1st Cir. 1994).

Furthermore, the voluntariness and foreseeability of the defendant's contacts depend on whether the defendant participated in the economic life of the forum and not just on the fact that the defendant formed a contract with the resident plaintiff. See Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928,

933 (1st Cir. 1985)(quoting Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1084 (1st Cir. 1973)); cf. McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)(holding it sufficient for purposes of due process that the defendant had participated in the economic life of the state and the contract had a substantial connection with the state).

The court has no difficulty finding that ADD participated in the economic life of Rhode Island. It sold Nico Water to Brooks, a Rhode Island company, which offered the product for sale in its stores, including those in Rhode Island. See Harwood Supp. Aff. ¶ 2 ("[T]he Defendant's product, Nico Water, was sold on a continuous basis in the State of Rhode Island."). ADD's product was advertised in the Providence Journal. See Lowman Aff. ¶ 11; see also Mem. Re Relatedness, Ex. B at 1 (noting newspaper advertising targeted specifically to Brooks Pharmacy communities). The company utilized Rhode Island distributors to distribute the product throughout the Northeast. See Mem. Re Relatedness, Ex. B at 1. Its employees and agents made numerous sales calls on Rhode Island companies in an effort to market the product. See Lowman Aff., Ex. 2. ADD directed numerous oral and written communications into the state. See Harwood Supp. Aff. ¶¶ 4, 8. By no means could these contacts by ADD be considered merely random, isolated, or fortuitous contacts with Rhode Island.

**i. Voluntariness**

It is clear that ADD voluntarily entered into the relationship with Plaintiff and that the relationship ultimately resulted in the formation of the June 9, 2003, agreement. Yet this fact will not by itself satisfy the purposeful availment prong. See Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 292 (1st Cir. 1999)("Without evidence that the defendant actually reached out to the plaintiff's state of residence to *create* a relationship--say by solicitation, see,

e.g., Nowak, 94 F.3d at 716-17--the mere fact that the defendant willingly entered into a tendered relationship does not carry the day."); Northeastern Land Servs., Ltd. v. Schulke, 988 F.Supp. 54, 58 (D.R.I. 1997). However, here ADD reached out to Plaintiff. Lowman repeatedly spoke to Plaintiff about ADD and its product. See Harwood Supp. Aff. ¶ 4. Powley requested the meeting with Plaintiff which resulted in the dinner at the Capital Grille restaurant. See Second Supp. Lowman Aff. ¶ 6. The day after that dinner Powley, Reder, and Owens sought Plaintiff's assistance to deal with the crisis created by the Maine legislation. See id. ¶ 7; see also Harwood Supp. Aff. ¶ 3. Thus, I find that ADD reached out to Rhode Island and solicited Plaintiff for his services. Accordingly, the requirement of voluntariness is satisfied.

**ii. Foreseeability**

The foreseeability component of purposeful availment requires that defendants have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985)(citing Shaffer v. Heitner, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977)(Stevens, J., concurring in judgment))(alteration in original). When a defendant intentionally directs activities at the forum state which relate to the alleged claims, there is such fair warning. See id. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984), and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984)). Here the activities which ADD intentionally directed toward Rhode Island, marketing its product to Brooks and other Rhode Island retailers, selling the product in Rhode Island, and using Rhode Island distributors to distribute the product throughout the Northeast, gave ADD such fair warning. Thus, there is evidence of "a

voluntary decision by the defendant to inject itself into the local economy as a market participant." Brian Jackson & Co. v. Eximias Pharm. Co., 248 F.Supp.2d 31, 35-36 (D.R.I. 2003). In addition, I find the fact that ADD reached out to Plaintiff and induced him to leave Rhode Island and go to Maine to perform services on behalf of ADD weighs in favor of finding that it was foreseeable that ADD would be subject to the jurisdiction of Rhode Island if a dispute regarding the performance of the agreement arose.

In sum, I find that it was foreseeable that ADD, by voluntarily availing itself of the benefits of Rhode Island law and by reaching out to Plaintiff, could be haled into court in Rhode Island. Accordingly, I find that the element of purposeful availment is satisfied.

**c. Gestalt Factors**

The third prong of the personal jurisdiction analysis, the Gestalt factors, arises after the establishment of minimum contacts and centers on whether the exercise of jurisdiction is reasonable. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-77, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). Reasonableness equates with "fair play and substantial justice." Id. (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)). As the court has concluded that the elements of relatedness and purposeful availment of the test for specific jurisdiction have been satisfied, discussion of the Gestalt factors is mandatory. Cf. Sawtelle v. Farrell, 70 F.3d 1381, 1394 (1st Cir. 1995)("[A] failure to demonstrate the necessary minimum contacts eliminates the need even to reach the issue of reasonableness ...."); United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp., 960 F.2d 1080, 1091 n.11 (1st Cir. 1992)("The Gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled.").

This third portion of the jurisdictional test is not inflexible and varies in accordance with the strength of the first two parts. That is, "the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994). On the other hand, "an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." Id.

**i. Defendant's Appearance Burden**

In terms of the burden of defending this suit in Rhode Island, "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994). Although ADD is located in California, its agents and employees have appeared in Rhode Island on multiple occasions. I do not find that ADD's burden of appearing is special or unusual. Therefore, this factor is not meaningful.[12]

**ii. Forum State's Interest**

In determining Rhode Island's interest in adjudication, this court should assess its legitimacy and "not ... *compare* [its] interest to that of some other jurisdiction ...." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 151 (1st Cir. 1995) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 483 n.26, 105 S.Ct. 2174, 2188 n.26, 85 L.Ed.2d 528 (1985), for the proposition that two forums may simultaneously have legitimate interests in the dispute's resolution). Here Rhode Island has an interest in seeing that a forum is provided to one of its citizens who was induced to leave Rhode Island for the purpose of

---

[12] Given that ADD has failed to answer or otherwise defend in this action, consideration of this factor may be academic for practical purposes.

performing services for an out of state defendant and then denied the agreed upon compensation. The fact that the services are related to the Rhode Island activities of ADD also weighs in favor of Rhode Island's exercise of jurisdiction.

**iii. Plaintiff's Interest in Relief**

The third factor obviously weighs in favor of Plaintiff. The aim is to ensure that Plaintiff is able to obtain "convenient and effective relief." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994). To achieve this end, a court must generally "accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience." Id. (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 211 (1st Cir. 1994)). It is indisputable that it is more convenient for Plaintiff to litigate this action in Rhode Island than in California.

**iv. Judicial System's Interest**

The key to applying this factor is ensuring "the most effective resolution of the controversy." Sawtelle v. Farrell, 70 F.3d 1381, 1395 (1st Cir. 1995). The court finds that the agreement was made in Rhode Island since Reder sent a fax to Lowman in Rhode Island on June 9, 2003, confirming the terms of the agreement, see Plaintiff's Affidavit in Proof of Claim (Document #11)("Aff. in Proof of Claim"), Att. 2 (Fax from Reder to Lowman of 6/9/03), which Plaintiff thereafter accepted, see Harwood Supp. Aff. ¶ 3. Accordingly, I find that Rhode Island law governs the agreement and that Rhode Island provides the best forum for resolution of the dispute between ADD and Plaintiff.

**v. States' Common Interest**

There are only three states with any arguable interest in this controversy: Rhode Island, Maine, and California. Of the three, Rhode Island has the greatest connection with the dispute. As a fundamental social policy, it is desirable that the court which is most concerned with a controversy (i.e., one where the

alleged wrongdoing has occurred within its jurisdiction) should adjudicate the dispute. Here the agreement or contract was made in Rhode Island when Plaintiff agreed to perform the services on the terms stated in the June 9, 2003, fax from Reder to Lowman. See Harwood Supp. Aff. ¶ 3. The fraud occurred in Rhode Island when ADD induced Plaintiff to leave Rhode Island while having no intention of paying Plaintiff. See Complaint ¶ 11. The breach of contract occurred when ADD failed to pay Plaintiff in Rhode Island the agreed amount. See id. ¶ 8. Thus, Rhode Island has the largest interest in this matter.

**vi. Summary Re Gestalt Factors**

It is apparent that all the Gestalt factors favor the exercise of jurisdiction by this court. Accordingly, I find that this court's exercise of jurisdiction over ADD is reasonable.

**d. Summary Re All Factors**

The court finds that all three prongs of the tripartite test for the exercise of specific personal jurisdiction, relatedness, purposeful availment, and reasonableness, are satisfied. See United States v. Swiss American Bank, Ltd., 274 F.3d 610, 626 (1st Cir. 2001). Accordingly, the court has personal jurisdiction over ADD.

**C. Service of Process**

"It is axiomatic that service of process must be effective under the Federal Rules of Civil Procedure before a default or a default judgment may be entered against a defendant." Maryland State Firemen's Ass'n v. Chaves, 166 F.R.D. 353, 354 (D. Md. 1996); see also Griffin v. Foti, No. Civ.A. 03-1274, 2003 WL 22836493, at *1 (E.D. La. Nov. 24, 2003)(holding that entry of default judgment against defendant who has never been served is not appropriate); Perafan-Homen v. Hasty, No. 00 Civ. 3883(RWS), 2000 WL 1425048, at *1-2 (S.D.N.Y. Sept. 26, 2000)(denying motion for default judgment because only proper defendant was never

served); Fed. R. Civ. P. 55(a)(providing for entry of default where party "fail[s] to plead or otherwise defend as provided by these rules ..."); Fed. R. Civ. P. 12(a)(1)(A)(requiring defendant to serve answer "within 20 days *after being served with the summons and complaint* ...")(italics added). "Before a default can be entered, the court must have jurisdiction over the party against whom the judgment is sought, which also means that the party must have been effectively served with process." 10A Charles Alan Wright et al., Federal Practice and Procedure § 2682 (3d ed. 1998)(footnote omitted).

Fed. R. Civ. P. 4(h) governs service of process upon corporations. It provides, in relevant part, that service upon a corporation (from which a waiver of service has not been obtained and filed) shall be effected:

> by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant ....

Fed. R. Civ. P. 4(h)(1). Alternatively, service may be effected "pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State ...." Fed. R. Civ. P. 4(e)(1) (to which Fed. R. Civ. P. 4(h)(1) refers). Rhode Island Superior Court Rule of Civil Procedure 4(f) provides in relevant part:

> (f) Service Outside State Within the United States; Personal Jurisdiction. **When** an individual or **a foreign corporation is subject to the jurisdiction of the courts of the state**, service of process may be made outside the state as follows:
>
> ....

> (2) Upon a foreign corporation by delivery of a copy of the summons and complaint by any disinterested person to the president, secretary, or treasurer of such corporation or to any agent or attorney for service of process designated by the corporation in the state of incorporation, or **by mailing a copy of the summons and complaint to any such officer or agent or to the corporation at its business address designated in the state of incorporation by registered or certified mail,** return receipt requested, or by any other method ordered by the court to give such corporation notice of the action and sufficient time to prepare any defense thereto.

R.I. Super. Ct. R. Civ. P. 4(f) (emphasis added). The court has already determined in the preceding section that it has personal jurisdiction over ADD. Thus, ADD may be served in accordance with the provisions of the above rule.

Plaintiff served ADD by mailing a copy of the Summons and Complaint to ADD's agent for service of process, Paracorp. See Mem. in Support, Ex. A (Listing Paracorp as Agent). The documents were sent by certified mail return receipt requested, see id., Ex. B at 1 (Letter from DiMaio to Paracorp of 2/26/04), and they were received by Paracorp on March 1, 2004, see id., Ex. B at 2 (return receipt showing delivery on 3/1/04). In addition, Plaintiff also mailed copies of the Summons and Complaint to the president, chief executive officer, and chief financial officer/ treasurer of ADD. See id., Ex. E at 1 (Cover letter from DiMaio to Reder of 2/26/04); id., Ex. C at 1 (Cover letter from DiMaio to Owens of 2/26/04); id., Ex. D at 1 (Cover letter from DiMaio to Kunin of 2/26/04). The copies were addressed to these officers at the company's business address of 5655 Lindero Canyon Road, Suite 120, Westlake Village, CA 91362, see id.; see also id., Ex. F (Letter from Owens to Harwood of 1/23/04, reflecting this business address), and were sent by certified mail return receipt requested, see Mem. in Support, Ex. C, D, E. The return

receipts indicate that the notice addressed to Kunin was received by him personally, see Mem. in Support, Ex. D at 2 (Copy of PS Form 3811), and that the notices sent to Reder and Owens were received by Kunin on their behalf, see id., Ex. E at 2 (Copy of PS Form 3811); id., Ex. C at 2 (Copy of PS Form 3811).

The record also reflects that ADD had actual notice that Plaintiff intended to sue for breach of the agreement. See Mem. in Support, Ex. F (Letter from Reder to Harwood of 1/23/04 acknowledging receipt of Plaintiff's proposed complaint). More importantly, the record discloses that ADD had actual knowledge of this lawsuit. See Aff. in Proof of Claim (Document #11), Att. 1 (Fax from Reder to Harwood of 3/17/04); Mem. in Support, Ex H (Letter from DeLuca to DiMaio of 3/22/04); id., Ex. K (Letter from DeLuca to DiMaio of 9/23/04); see also Plushner v. Mills, 429 A.2d 444, 446 (R.I. 1981)("In construing Rule 4(d)(1) of the Federal Rules of Civil Procedure, the courts have broadly interpreted its provisions where the defendant or defendants have received actual notice of the suit.")(quoting Adams v. Sch. Bd. of Wyoming Valley West Sch. Dist., 53 F.R.D. 267, 268 (1971); Nowell v. Nowell, 384 F.2d 961 (5th Cir. 1967)).

In sum, I find that this court has jurisdiction over ADD in that service of process was effected on its agent for service of process, Paracorp, and also on its president, chief executive officer, and chief financial officer. Such service satisfies the requirements of Fed. R. Civ. P. 4(h)(1) (citing Fed. R. Civ. P. 4(e)(1)); see also R.I. Super Court R. Civ. P. 4(f). In addition, I find that ADD had actual notice of this lawsuit.

**IV. Damages**

"In the Rule 55 context, a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default." KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003); cf.

HMG Prop. Investors, Inc. v. Parque Indus. Rio Canas, Inc., 847 F.3d 908, 919 (1st Cir. 1988)("It is settled that, if arriving at the judgment amount involves nothing more than arithmetic--the making of computations which may be figured from the record--a default judgment can be entered without a hearing of any kind.").

Here there is enough doubt about the amount owed to require an evidentiary hearing. See KPS & Assocs., Inc. v. Design by FMC, Inc., 318 F.3d at 18 (finding district court abused its discretion in failing to conduct further inquiry before fixing the base quantum of damages where there were obvious discrepancies between the damages claimed in the body of the complaint and the damages requested in the ad damnum clause, there were serious arithmetical errors in the affidavit filed with the complaint, and "there would still be a need for further inquiry given the nature of KPS's claim"). Plaintiff's Aff. in Proof of Claim (Document #11) states that on June 9, 2003, Reder sent "e-mail correspondence agreeing to pay a total of $150,000.00 comprising of $10,000.00 check, $40,000.00 worth of stock warrants, and $100,000.00 upon successful completion for services in a consulting capacity for Defendant's lobbyists in the State of Maine." Plaintiff's Aff. in Proof of Claim ¶ 3. Plaintiff goes on to affirm that Reder "reaffirm[ed] the obligation by a written agreement dated March 17, 2004, attached hereto and incorporated by reference ...." Id. ¶ 6. The problem is that the March 17, 2004, written agreement "reaffirm[ing] the obligation," id., reflects significantly different terms than those stated in the June 9, 2003, e-mail. The e-mail message states that Plaintiff is to receive a total of $150,000.00 in the form of a check for $10,000.00, stock warrants worth $40,000,00, and $100,000.00 in an unspecified form (presumably check). The March 17, 2004, written agreement only refers to the payment of $10,000.00 cash and $50,000.00 worth of common stock "at a per

share price equal to the closing price on the day following the effective date of the Company's pending reverse stock split." Aff. in Proof of Claim, Att. 1 (Fax from Reder to Harwood of 3/17/04).

Even if this problem did not exist, it is not clear how the value of the warrants referenced in the June 9, 2003, e-mail was to be determined. There is no indication what date was to be used for purposes of determining the value of the warrants: their value on June 9, 2003; their value on the date Plaintiff went to Maine and performed the services; their value on the date it became clear that the legislation in Maine would not be enacted; or their value on some other date. Accordingly, I find that there is doubt as to the amount to which Plaintiff is entitled as a result of ADD's default and that a damages hearing should be held. See KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 19 (1st Cir. 2003). I so recommend.

**Conclusion**

For the reasons stated above, I recommend that the Second Application for Default Judgment be granted. I further recommend that a damages hearing be held to determine the amount of the judgment to be entered.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

David L. Martin

David L. Martin
United States Magistrate Judge
March 10, 2005